**Vernon C. TURMAN, Plaintiff–Appellant,**

v.

**Dennis HAWLEY, Defendant–Appellee.**

No. 01–1817.

United States Court of Appeals,
Seventh Circuit.

Submitted July 11, 2002 *.

Decided July 11, 2002.

Before EASTERBROOK, DIANE P. WOOD, WILLIAMS, Circuit Judges.

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

ORDER

Indiana inmate Vernon Turman brought this action under 42 U.S.C. § 1983, alleging that Dr. Dennis Hawley acted with deliberate indifference toward his serious medical needs by ignoring his request for a surgical procedure. The district court denied relief, and we affirm.

From October 1997 to May 1998, Dr. Hawley worked in Indiana as the regional medical director for Prison Health Services, Inc., (PHS)—an organization that provides medical services and doctors to institutions run by the Indiana Department of Corrections. As regional medical director, Dr. Hawley's duties included overseeing the provision of "specialty medical services" at Indiana's prisons. When physicians employed by PHS at a particular prison site wanted to send an inmate with a "non-emergency" medical condition for treatment outside the prison, they would submit an outpatient referral request form to Dr. Hawley's office, and Dr. Hawley would review the request and send it on to PHS's national office in Tennessee, typically (though not always) with a recommendation. The national office would then evaluate the request and either approve, deny, or seek additional information about the requested treatment. The national office's decision would then be sent to both Dr. Hawley and the on-site physician who made the request.

In 1994 physicians in Michigan City, Indiana, performed a biopsy on a large nevus sebaceous (a mole composed of sebaceous glands) on the left side of Turman's face. The biopsy revealed that the lesion was benign, but because of the risk that basal cell carcinoma might develop, physicians at Wishard Memorial Hospital in Indianapolis decided to remove the lesion in

1997 through a series of four surgical excisions. Doctors at Wishard removed portions of the lesion in January, April, and August, and noted after the third procedure that Turman should return in four or five months for the fourth (and final) surgery. In December Turman wrote a letter to the dermatology clinic at Wishard to ask that they contact the medical staff at Westville Correctional Center (where Turman had been transferred) to schedule his final surgery. About two weeks later Turman also submitted a health care request to the medical staff at Westville, explaining that he was scheduled for another treatment at Wishard and that he needed the treatment "due to the itching and pain in the area they're treating."

On December 31 the medical staff at Westville submitted an outpatient referral request form to PHS (it is unclear whether this request was submitted to PHS's national or regional office), in which they sought approval for Turman's off-site medical care at Wishard. In January doctors at Wishard, Jeffrey Peterson and Charles Lewis, also wrote a letter to the medical staff at Westville, in which they explained Turman's condition and asked that he be scheduled to have the remaining lesion excised. When nothing happened, Turman in February submitted another health care request to the medical staff at Westville, asserting that he was still waiting to return to Wishard and that he was in "more worst shape." The staff at Westville responded that they had sent the paperwork to PHS and that they were awaiting approval. Then, at the end of March, someone from PHS told the medical staff at Westville to fax the referral again, which they did (noting this time that the referral was transmitted to Dr. Hawley).

In April Dr. Colin Elliott, a physician at Westville, examined Turman at the prison and determined that he did not need a fourth procedure at Wishard. Dr. Elliott instead recommended that Turman undergo cryosurgery at the prison, an option that Turman refused. After Dr. Elliott's examination, no further requests for off-site treatment were sent from Westville, and it is unclear what happened to the referral sent on December 31 or the duplicate fax sent in March. Dr. Hawley does not recall having ever received a request concerning Turman, though it appears that a request did reach PHS's national office since a note recorded on Turman's chart a year after the first referral was sent reflects that "PHS had denied follow-up" at Wishard "due to cosmetic."

In July 1998 Turman filed this action under § 1983, seeking damages and an order that Dr. Hawley "stop obstructing the plaintiff's access to medical personnel." Because Dr. Hawley did not file an appearance, the district court entered a default judgment for $10,000 in July 1999 and ordered the department of corrections to transport Turman to Wishard for further treatment. Within thirty days, Dr. Hawley and the department appeared, filing timely notices of appeal as well as motions under Federal Rule of Civil Procedure 60(b) to vacate the default judgment because they had not been properly served and because the department was never made a party to the case. Upon learning from Dr. Hawley and the department that the district judge was inclined to grant their motions, see *Boyko v. Anderson,* 185 F.3d 672, 675 (7th Cir.1999) (explaining the procedure by which a district court may indicate its willingness to grant a Rule 60(b) motion while the case is pending in the court of appeals), we remanded the case, and the district court vacated its judgment and issued an order clarifying that the department was not a party to the action. In the meantime, however, the medical staff at Westville had already referred Turman to Wishard (as the district

court had originally directed), where Turman's final surgery was performed in November. Dr. Hawley then moved for summary judgment, which the district court granted.

On appeal Turman argues that the district court improperly granted summary judgment because he raised genuine issues whether Dr. Hawley acted with deliberate indifference toward his serious medical needs by ignoring, or by allowing his staff to ignore, the outpatient referral requests sent by the medical staff at Westville. Although Dr. Hawley did not have responsibility for Turman's day-to-day medical care, knowingly denying or delaying access to necessary treatment for a serious medical condition can violate the Constitution. *See Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir.2000) (explaining that medical professionals who know that they serve as a "gatekeeper" for other medical personnel capable of treating a serious condition may be liable if they delay or refuse to fulfill their "gatekeeper role"). To prevail on his deliberate indifference claim, Turman therefore needed to present evidence that he had an objectively serious medical condition and that Dr. Hawley knew of the condition and disregarded it. *See Farmer v. Brennan,* 511 U.S. 825, 834–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Garvin v. Armstrong,* 236 F.3d 896, 898 (7th Cir.2001).

Turman contends that because he did not receive the fourth surgery scheduled at Wishard he suffered pain, migraines, itching, and emotional distress. Although it is unclear whether Turman's benign lesion itself posed a serious risk to his safety, severe pain can constitute an objectively serious medical condition, *see Walker v. Benjamin,* 293 F.3d 1030 (7th Cir.2002) (discussing cases), and in any event, Dr.

Hawley does not argue that Turman failed to raise a genuine issue whether his condition was objectively serious. Nor does Dr. Hawley contend that some factor other than the lack of a fourth surgery proximately caused Turman's pain. *See Henderson v. Sheahan,* 196 F.3d 839, 848 (7th Cir.1999). We therefore focus our attention on the subjective component of the *Farmer* test.

There is no direct evidence (such as an admission) that Dr. Hawley knew of Turman's painful condition, so Turman must rely on circumstantial evidence to impute the requisite mental state to Dr. Hawley. *See Farmer,* 511 U.S. at 842, 114 S.Ct. 1970 (explaining that knowledge of a substantial risk may be inferred from circumstantial evidence). The record contains evidence that the medical staff at Westville made two requests to PHS for Turman's off-site treatment at Wishard. The problem is that even assuming (for the purposes of summary judgment) that these requests reached Dr. Hawley or a member of his staff, there is nothing in the requests themselves that might have alerted Dr. Hawley to Turman's painful condition and no evidence that any other information about Turman was ever sent to Dr. Hawley. The request sent in December, for example, says only that Turman had a "follow up app[ointment] with Dr. Peterson [at the] dermatology clinic." The form does not specify the purpose of the appointment, describe Turman's condition, or suggest that the condition was painful. And the record contains no information about the fax sent to Dr. Hawley in March; Turman's chart contains simply a notation reflecting that a request for off-site care had been sent. To prevail, Turman needed to present evidence that Dr. Hawley was aware of facts supporting an inference that he had a serious medical condition and that Dr. Hawley "drew the inference." *Reed v. McBride,* 178 F.3d 849, 854 (7th

Cir.1999); *see Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. Here, however, there is no reason to think that Dr. Hawley—had he seen the requests—would have concluded that Turman was in serious pain. The delay in treating Turman's condition may well have resulted from bureaucratic obstacles, or even negligence, but there is no evidence that it occurred because of Dr. Hawley's deliberate indifference. The district court therefore properly granted summary judgment, and its judgment is

AFFIRMED.